**Piper DAILEY, f/n/a Seaman, Plaintiff,**

v.

**Jo Anne B. BARNHART, Defendant.**

**No. 02–CV–6145L.**

United States District Court,
W.D. New York.

July 24, 2003.

Mark M. McDonald, Bond and Mc-Donald, P.C., Geneva, NY, for Plaintiff.

Brian M. McCarthy, AUSA, U.S. Attorney, Rochester, NY, for Defendant.

*DECISION AND ORDER*

LARIMER, District Judge.

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner") that plaintiff was not disabled under the Social Security Act, and therefore, was not entitled to

disability benefits. Both plaintiff and the Commissioner have moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). As discussed below, the Commissioner's decision is remanded for further administrative proceedings consistent with this decision.

## PROCEDURAL HISTORY

Plaintiff Piper Dailey ("Dailey")[1] applied for Disability Insurance Benefits on September 14, 1999. She claimed disability due to pain in the back, left shoulder and arm, carpal tunnel syndrome (CTS), and chronic headaches (T. 11)[2], with an onset date prior to the expiration date of her insured status, December 31, 1998. Her claim was denied initially and upon reconsideration by the Social Security Administration.

Dailey requested a hearing and on October 4, 2000 one was held before an administrative law judge ("ALJ") in Rochester, New York. On January 3, 2001, the ALJ issued his decision holding that, although Dailey was unable to return to her former employment, she was able to make an adjustment to other work that existed in significant numbers in the national economy. Therefore, the ALJ denied benefits. This decision became the final decision of the Commissioner on March 1, 2002 when the Appeals Council denied Dailey's request for review.

Pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), Dailey commenced this action on April 14, 2002, seeking review by this Court of the Commissioner's final decision.

## FACTUAL BACKGROUND

Dailey was born on August 15, 1954.[3] She has an 11th grade education and has obtained a GED. (T. 29). The ALJ found that she had past relevant work experience as a toll collector, clerk/carrier, and motel manager. (T. 17). He also found that Dailey had not engaged in substantial gainful activity since July 31, 1994 (T. 17), when she quit her job as a toll collector due to pain caused by the back/neck injuries sustained as a result of falling on ice in February 1994. Dailey received subsequent injuries in October of 1999, when her back gave out while descending stairs.[4] (T. 141–2). Her fall resulted in a fractured hip (T. 143, 177) and a torn rotator cuff in her left shoulder (T. 227).

The medical records contained in the transcript reflect a long history of back and neck pain as well as chronic headaches. Dailey sought treatment for these symptoms from a number of practitioners, including physicians, orthopedic surgeons, chiropractors, and an occupational therapist. According to Dr. Stephen Lasser, an orthopedic surgeon, Dailey suffered from cervical,[5] thoracic,[6] and lumbar[7] spine

---

1. At the time of this application, plaintiff was known as Piper Seaman.

2. "T. __" refers to the page of the transcript of the administrative record filed by the Commissioner with her Answer.

3. Dailey was 46 years old on the date of the hearing.

4. This event happened on October 11, 1999, approximately ten months after Dailey's insured status expired.

5. Cervical is defined as "Relating to a neck..." *Stedman's Medical Dictionary* 324 (27th ed.2000).

6. The thoracic region of the back is "the upper part of the trunk between the neck and the abdomen." *Stedman's Medical Dictionary* 1829 (27th ed.2000).

7. Lumbar is defined as "...the part of the back and sides between the ribs and the pelvis." *Stedman's Medical Dictionary* 1034 (27th ed.2000).

pain, due to a combination of spondylolisthesis,[8] degenerative scoliosis, degenerative disc disease ("DDD"), fibromyalgia,[9] and myofascial pain syndrome[10] (T. 185 & 187) prior to and following the expiration of her insured status on December 31, 1998. Dailey also suffered from bilateral carpal tunnel syndrome ("CTS") (T. 242) and a headache syndrome (T. 204). Additional injuries after December 31, 1998, sustained when she fell on stairs in late 1999, include, as mentioned above, a pelvic fracture and a torn rotator cuff in the left shoulder.

Dailey testified at the hearing before the ALJ that she could not lift more than 3–5 pounds and could not sit for more than 10–15 minutes without having to change positions. (T. 34). To stand, she had to rest one foot on something to relieve low back pain, which came on after 5–10 minutes of standing. She stated that she could only walk about half a block and that she had occasional numbness in her left hand and leg which "comes and goes." (T. 35). Her headaches lasted throughout the day.[11] She used a hot pack wrapped around her neck to relieve neck pain caused by the headaches or took Vicodin (a prescription pain reliever) when the headaches were especially bad. (T. 36). Her headaches were often so bad that she was unable to concentrate because of the pain.[12] (T. 38).

Her pain woke her up in the morning and she needed assistance with shopping and housecleaning because she could not perform those chores. (T. 40).

## DISCUSSION

### I. Standard for Determining Disability

A person is "disabled" under the Act and therefore entitled to benefits, when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify for benefits, the disability must be the result of an "anatomical, physiological or psychological abnormalit[y], demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). Such a disability will be found to exist only if an individual's impairment is "of such severity that [s]he is not only unable to do h[er] previous work, but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

### II. The ALJ's Decision

In determining whether plaintiff was entitled to receive disability benefits, the

---

**8.** Spondylolisthesis is defined as "forward movement of the body of the lower lumbar vertebrae on the vertebra below it, or up on the sacrum." *Stedman's Medical Dictionary* 1678–9 (27th ed.2000).

**9.** Fibromyalgia is defined as "A syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest); additionally there must be point tenderness in at least

11 of 18 specified sites." *Stedman's Medical Dictionary* 671 (27th ed.2000).

**10.** Myofascial is defined as "Of or relating to the fascia surrounding and separating muscle tissue." *Stedman's Medical Dictionary* 1173 (27th ed.2000).

**11.** Dailey testified that she had a headache approximately 11 to 12 hours out of a 14 hour day. (T. 37).

**12.** Dailey also attributed problems with concentration and memory due to the use of Vicodin, which "spaces her out." (T. 37).

ALJ proceeded through the required five-step inquiry. *See Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002) (discussing five-step process delineated in the relevant regulations); 20 C.F.R. § 404.1520. At the first step of this inquiry, the ALJ found that Dailey had not engaged in substantial gainful activity since July 31, 1994. (T. 17). Next, the ALJ found that Dailey suffered from a disorder of the back (discogenic and degenerative), a severe impairment that significantly limited her ability to do basic work activities. (T. 17). The ALJ then found that these impairments did not meet or equal the criteria listed in 20 C.F.R. pt. 404, subpt. P, app. 1. (T. 17). The ALJ proceeded to the fourth step and determined that Dailey did not have the capacity to return to her past relevant work. (T. 17).

■ At the fifth and final stage of this process, the burden shifts to the Commissioner "to prove that the claimant is capable of performing 'any other work.'" *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998) (quoting *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996)). Utilizing Medical Vocational Rule 201.21, Table 1, the ALJ considered Dailey's age, educational background, work experience, and residual functional capacity on the date her insured status expired, and concluded that she was able to make a successful vocational adjustment and had the residual functional capacity ("RFC") to perform sedentary work in positions which he found to exist in significant numbers in the national economy. (T. 17–18, # 11); *see* 20 C.F.R. pt. 404, subpt. P, app. 2. Thus, the ALJ found that Dailey was not disabled under the Act.

### III. The Standard of Review

■ The Commissioner's decision that Dailey was ineligible to receive benefits must be affirmed if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir.2002); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842(1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Thus, "[i]t is not the function of a reviewing court to decide de novo whether a claimant was disabled." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," a court cannot substitute its own judgment for that of the Commissioner. *Veino,* 312 F.3d at 586.

■ Such a deferential standard, however, is not applied to the Commissioner's conclusions of law. *Townley v. Heckler,* 748 F.2d 109, 113 (2d Cir.1984); *accord Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999). This Court must independently determine if the Commissioner applied the correct legal standards in determining that the plaintiff was not disabled. "Failure to apply the correct legal standards is grounds for reversal." *Tejada,* 167 F.3d at 773. In its review, this Court must first review the legal standards applied, and then, if the standards were correctly applied, determine whether the Commissioner's decision is supported by substantial evidence. *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987).

### IV. Issues on Appeal

Dailey argues that the ALJ's RFC determination that she was capable of performing a full range of sedentary work is not supported by substantial evidence and was arrived at by application of improper

legal standards. Specifically, Dailey contends that the erroneous RFC was a result of the ALJ's: (A) failure to properly weigh the opinions of her treating physicians; (B) failure to utilize the services of a vocational expert; and (C) failure to properly assess Dailey's credibility.

The Commissioner contends that her decision must be affirmed because substantial evidence demonstrates that plaintiff's alleged impairment did not prevent her from engaging in substantial gainful activity on or before December 31, 1998.[13]

### V. Treating Physicians' Opinions

■ Dailey argues that the ALJ erred by failing to properly review and address the opinions of her treating physicians, identified as Drs. Bruce Kline and Lasser, in accordance with applicable law and the Commissioner's own regulations. I agree with Dailey that the ALJ erred in this regard.

■ The "treating physician rule" requires that the "medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir.2000); *see* 20 C.F.R. § 404.1527(d)(2). Dr. Kline, an orthopedic physician, and Dr. Lasser, an orthopedic surgeon, are Dailey's treating physicians. Each doctor is a specialist that examined and treated Dailey on multiple occasions over a sustained period of time.

■ The record contains several reports from Drs. Kline and Lasser as well as statements from Matthew DiDuro, a chiropractor, and John Hartman, an occupational therapist, that are relevant in determining Dailey's medical condition prior to and around the time her insured status expired on December 31, 1998.[14] On June 11, 1996, Dr. Kline stated that he would keep Dailey out of work until she came back for a follow-up and that if she was doing better at that time that he would consider sending her back to work with restrictions that included "no lifting greater than 15 pounds, no frequent bending, twisting, pushing and pulling type activities." (T. 249). On August 6, 1996, Dr. Kline saw Dailey for the follow-up visit and determined that her condition had worsened. Dr. Kline proposed she get a functional capacity exam and he offered Dailey a referral to Dr. Lasser for further review of her condition and treatment options. (T. 246). With regard to her work, he directed that Dailey was to be "[o]ut of work until further notice." *Id.*

As requested by Dr. Kline, a functional capacity evaluation was performed on September 20, 1996 by John Hartman, OTR/L.[15] This evaluation determined that Dailey was only capable of sitting, pushing,

---

**13.** Plaintiff does not dispute that her insured status expired on December 31, 1998 and must demonstrate that she was under a disability on and before this date.

**14.** Medical opinions given after the date that Dailey's insured status expired are taken into consideration if such opinions are relevant to her condition prior to that date. The expiration date should not act as a cutoff with regard to the reports considered on this specific issue. *See Arnone v. Bowen*, 882 F.2d 34, 39 (2d. Cir.1989); *see also* Social Security Ruling 83–20, 1983 WL 31429, *2 (S.S.A.)

("With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling.... In such cases, it will be necessary to infer the onset date from the medical *and other evidence* that describe the history and symptomatology of the disease process." (emphasis added.))

**15.** OTR/L is an abbreviation for an "Occupational Therapist, Registered," a state licensed position.

pulling, and overhead reaching on an occasional basis.[16] More significantly, evaluation of her "Positional Tolerance" determined that Dailey could only sit for 10–15 minutes, walk for 30 minutes and stand for 30 minutes before requiring a change of position. (T. 172).

Dailey began a treating relationship with Dr. Lasser on November 27, 1996. Dr. Lasser believed that "[d]espite her multiple symptoms," with conservative treatment, Dailey would be able to cope with her condition as long as she made an "appropriate modification of lifestyle" and did not "put excessive stress on her back." (T. 186). He concluded that, "I would agree with a 75% permanent partial impairment involving her cervical, thoracic and lumbar spines." *Id.*

Dailey began treatment with chiropractor Matthew DiDuro on January 24, 1997.[17] DiDuro determined Dailey's restrictions to be: "No lifting more than 5 lbs.; No sitting or standing for more than 1 half hr.; Weather conditions—cold is not good for her condition." (T. 168).

On February 4, 1997, Dr. Kline concluded that if a job could be adapted to the limitations of "no lifting greater than 10 lbs., no frequent lifting, bending, pushing, pulling, sitting or standing," then Dailey could return to work. (T. 134).

On November 26, 1997, Dr. Lasser reported that Dailey's condition was "[e]s-sentially unchanged" since her last visit on November 27, 1996, and he found that she had a "marked partial" disability. (T. 186–187). Dailey next saw Dr. Lasser on April 14, 1999, just four and a half months after Dailey's insured status expired. He determined that surgery was not an option and concluded that Dailey continued to have a "75% marked partial" disability. *Id.* Further, he found that "she can only do extremely sedentary limited part-time work. Lifting more than 10 pounds would not be reasonable and her tolerance to this level of activity is very questionable." (T. 185).

Based on the reported medical opinions of Drs. Kline and Lasser, as well as the statements of DiDuro and Hartman, Dailey cannot perform the full range of sedentary work as defined by the Commissioner's own regulations. "In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals." Social Security Ruling 96–9p, 1996 WL 374185, *6 (S.S.A). Indeed, "[b]y its very nature 'sedentary' work requires a person to sit for long periods of time even though standing and walking are occasionally required." *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983). Here, the ALJ found that Dailey retained the residual functional capacity to

---

**16.** "Occasionally" is defined on the functional capacity exam document as 0 to 33% of the day. (T. 172).

**17.** The opinions of Matthew DiDuro, a chiropractor, and John Hartman, an OTR/L, are not medical opinions, since they are not "physicians, psychologists or other acceptable medical sources." *See* 20 C.F.R. § 404.1527(a)(2). Section 404.1513(a) lists five categories of "acceptable medical sources," none of which include chiropractors or occupational therapists. Instead, both sources are expressly listed in a different section, under "other sources" whose "[i]nformation…may also help us to understand how your impairment affects your ability to work." 20 C.F.R. § 404.1513(d)(1). Thus, while DiDuro and Hartman are not "treating sources," and the ALJ need not treat them as such, their opinions should be considered as helpful in evaluating Dailey's condition over time. Nonetheless, it appears as though the ALJ in his decision had considered DiDuro as the one and only treating physician.

perform "all sedentary work activity." (T. 15). However, this finding is inconsistent with the restrictions on sitting imposed by Drs. Kline, Lasser, DiDuro and Mr. Hartman. *See* SSR 96–9p, at *6 ("If an individual is unable to sit for a total of 6 hours in an 8–hour work day, the unskilled sedentary occupational base will be eroded.").

■ Moreover, the ALJ failed to evaluate whether the opinions of Drs. Lasser and Kline were entitled to controlling weight, and failed to specify the weight he gave to their opinions. The law is clear that "the Social Security Administration is required to explain the weight it gives to the opinions of a treating physician." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even—and perhaps especially—when those dispositions are unfavorable." *Id.* at 134. The Commissioner's own regulations require such disclosure as well. "We will always give *good reasons* in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 1527(d)(2) (emphasis added). "When we do not give the treating source's opinion controlling weight, we apply the factors in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion." *Id.* These factors include the length of the treatment relationship, the nature and extent of the relationship, the supportability of the source's opinion, the consistency with other medical evidence in the record, whether the opinion involves the specialty of the physician, and any other factors that might be relevant. *See* 20 C.F.R. § 1527(d)(2)-(6).

■ Other than the length of treatment, the factors listed above were not mentioned by the ALJ in his decision.

The ALJ simply does not articulate the reasons for the weight he assigned, if any, to the opinions of Drs. Kline and Lasser. This lapse alone constitutes legal error and requires that the case be remanded. *See Schaal*, 134 F.3d at 505 ("failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constitutes legal error...[and]... the proper course is to direct that [the] case be remanded to the SSA to allow the ALJ to reweigh the evidence....").

Furthermore, there are clear deficiencies in the ALJ's analysis. In making his determination, the ALJ arbitrarily selects separate and independent findings from many sources and does not rely on any specific medical opinion in arriving at the conclusion that Dailey retained the residual functional capacity to perform the exertional demands of sedentary work. (T. 15). In addition, the ALJ's findings in support of his conclusion are flawed. Specifically, the ALJ held as follows:

> The claimant alleges inability to work due to pain in the back, neck, and left shoulder. However, the clinical and objective findings are inconsistent with an individual experiencing totally debilitating symptomatology. X-rays of the lumbar spine showed scoliosis with only mild degenerative disease (Exhibit 7F). In addition, there has been no showing of significant range of motion deficit or neurologic dysfunction of the upper or lower extremities (Exhibit 18F). MRI of the brain was negative. Her EEG was normal (Exhibit 2F). X-rays of the right knee showed only mild degenerative changes. A March 8, 1997 report, showed that the claimant had mild CTS (Exhibit 18F/4). A July 13, 2000 report, by Dr. Lasser, showed that the claimant's left shoulder had improved (Exhibit 20F/11). The claimant is able to care

for her own personal needs, perform some household chores, drive and otherwise move about and function on a regular basis. Although the claimant testified she experiences disorientation and bowel problems from her medications, there is no evidence the claimant has reported experiencing significant side effects from her medications to any medical source of record or that her medications have been frequently changed or the dosages altered due to side effects and/or ineffectiveness. There is no indication of any psychological and physiological abnormalities which would preclude all work activities. Thus, while the claimant would not be able to perform the more arduous forms of employment that would put undue pressure on her low back, there is no restriction to the claimant's functional capacity to preclude the performance of all sedentary work activity. (T.15)

Contrary to the ALJ's decision, nowhere in exhibit 7F is plaintiff's degenerative disease characterized as "mild." Rather, the impression of Dr. Auerbach was "Degenerative disk disease at multiple levels of the spine, cervical, thoracic, and lumbar." (T. 204). Furthermore, I fail to see why the improved condition of her shoulder in July 2000 is germane to her condition on December 31, 1998. I also fail to see the relevance of her disorientation and bowel problems at the time of the hearing. Likewise, relying on the statement that Dailey can "care for her own personal needs, perform some household chores, drive and otherwise move about and function on a regular basis" is not supported by substantial evidence and is in direct conflict with Dailey's testimony, the testimony of other witnesses (T. 106), and the record evidence as a whole.

 It appears that the ALJ substituted his own opinion for that of plaintiff's

treating physicians, who share the opinion that, in light of her restrictions, Dailey is not capable of performing a full range of sedentary work activity. *Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir.1998) (noting that it is improper for an ALJ to "set his own expertise against that of a physician who submitted an opinion or testified before him."). In the absence of a medical opinion to support the ALJ's finding as to Dailey's ability to perform sedentary work, it is well settled that "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." *Id.* at 81 (citing *McBrayer v. Sec'y of Health and Human Servs.,* 712 F.2d 795, 799 (2d Cir. 1983)); *see also Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir.1999).

Accordingly, I find no "overwhelmingly compelling" evidence in the ALJ's decision to permit him to "overcome" the otherwise valid medical consensus that emerges from the medical record as a whole that plaintiff cannot perform the full range of sedentary work. *See Wagner v. Sec'y of HHS,* 906 F.2d 856, 862 (2d Cir.1990) ("a circumstantial critique by [a] non-physician [ ], however thorough or responsible, must be overwhelmingly compelling" to justify a denial of benefits).

A remand to further develop the record is necessary. The evidence is not so compelling that this Court can direct a remand for the immediate calculation and payment of benefits. The record needs to be developed utilizing a vocational expert to determine whether there is some work available to plaintiff with all of her restrictions.

## VI. Failure to Call Upon the Services of a Vocational Expert & Improper Use of the Medical Vocational Guidelines

 As mentioned above, the ALJ concluded that, on the date her insured status expired, Dailey was able to make a suc-

cessful vocational adjustment to work that existed in significant numbers in the national economy, based on her age, educational background, and residual functional capacity. Dailey disputes this finding and contends that the ALJ erred in failing to obtain the testimony of a vocational expert to assist in determining her RFC since she is affected by both exertional and nonexertional limitations.

The relevant evidence indicates that Dailey is unable to sit and stand for certain or long periods of time.[18] *See* (T. 34). There are times when an "RFC is compatible with the performance of sedentary work except that the person must alternate periods of sitting and standing." Social Security Ruling 83–12, 1983 WL 31253, *4 (S.S.A.). "Such an individual is not functionally capable of doing ... the prolonged sitting contemplated in the definition of sedentary work ..." *Id.*

The Court finds SSR 96–9p most instructive on this issue:

Alternate sitting and standing: An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. It may be especially useful in these situations to consult a vocational resource in order to determine whether the individual is able to make an adjustment to other work..... When the extent of the erosion of the unskilled sedentary occupational base is not clear, the adjudicator may consult various authoritative written resources, such as the DOT, the SCO, the Occupational Outlook Handbook, or County Business Patterns. In more complex cases, the adjudicator may use the resources of a vocational specialist or vocational expert. The vocational resource may be asked to provide any or all of the following: An analysis of the impact of the RFC upon the full range of sedentary work, which the adjudicator may consider in determining the extent of the erosion of the occupational base, examples of occupations the individual may be able to perform, and citations of the existence and number of jobs in such occupations in the national economy. Social Security Ruling 96–9p, 1996 WL 374185, *7 (S.S.A.).

In light of the facts of this case, I find that the ALJ improperly relied on the Medical Vocational Guidelines in determining that plaintiff was not disabled. *See Rosa*, 168 F.3d at 78 ("Although the grid results are generally dispositive, exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations."); *see also Zorilla v. Chater*, 915 F.Supp. 662, 667 (S.D.N.Y.1996) ("[S]ole reliance on the grids may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the

---

**18.** John Hartman, an occupational therapist, believed Dailey could only sit for less than 33% of the day and required a change of position after sitting for 10–15 minutes. (T. 172). Dailey's chiropractor determined that she could not sit for more than 30 minutes at one time. (T. 168). Dr. Kline, Dailey's orthopedic physician, determined that she could not sit on a "frequent" basis. (T. 134).

range of sedentary work that the claimant can perform."). On remand, the ALJ should utilize the services of a vocational expert. Dailey's need to alternate sitting and standing likely affects the scope of work available to her.

Furthermore, there is also an issue with regard to Dailey's chronic headaches, which are well documented throughout the record. The ALJ dismissed Dailey's complaints of severe headaches as not credible. However, as explained below, the ALJ's credibility determination is not supported by substantial evidence. Therefore, the ALJ should consider whether Dailey's headaches creates a nonexertional impairment that limits the jobs that she could still perform.

## VII. Credibility Determinations

The ALJ is entitled to evaluate the credibility of all witnesses, including the claimant. *See Carroll,* 705 F.2d at 642. In doing so, the ALJ may consider a claimant's "physical demeanor" at the hearing. However "such observations should be assigned only limited weight." *Schaal,* 134 F.3d at 502. The ALJ's finding must be consistent with the other evidence in the record. *See Williams ex rel. Williams v. Bowen,* 859 F.2d 255 (2d Cir.1988).

Here, the ALJ found that Dailey's testimony was not credible and gave specific reasons, set forth in detail below, in support of this determination. (T. 15). Dailey argues that the reasons given by the ALJ are not supported by substantial evidence. The Court agrees. The evidence set forth by the ALJ is not evidence a reasonable mind might accept as adequate to support the conclusion that Dailey's testimony is not credible. *Richardson,* 402 U.S. at 401, 91 S.Ct. 1420.

First, the ALJ found Dailey's testimony inconsistent with regard to her headaches. At the hearing, Dailey testified that she suffered from headaches lasting approximately 11 to 12 hours out of a 14–hour awake-period. (T. 36–37). According to the ALJ, this testimony was not credible because "although claiming a headache, she was alert and able to respond easily and appropriately." (T. 15). However, Dailey testified her headaches range in severity; sometimes they were like the one she was having at the hearing (T. 38), other times she said they were "so bad that I want to cry." (T. 36).

Second, the ALJ found Dailey's testimony inconsistent with the medical record in regard to her ability to lift certain weight. *See* (T. 15) ("She claims she can lift only 3 to 5 pounds yet even her physician gives her sedentary residual functional capacity."). It is unclear which physician the ALJ is referring to here or when Dailey was given this level of exertional capacity. Nevertheless, this reasoning attempts to split hairs. Someone performing at a residual functional capacity can lift up to 10 pounds and Dailey's testimony is consistent with her exertional capacity. Dailey, in fact, was told by her chiropractor, Matthew DiDuro, that she should lift only 5 pounds. (T. 168).

Third, the ALJ believed that Dailey was not credible because she claimed the need to "write down [her] appointments." According to the ALJ, "[t]his is not unusual and none of the impairments alleged by the claimant would likely result in impaired memory." (T. 15). It is unclear how this is a basis for finding Dailey's testimony not credible. In any event, Dailey never testified that her memory problem was directly due to one of her impairments. Rather, her testimony regarding her memory was in response to questions concerning her use of the pain reliever Vicodin. (T. 41).

Fourth, the ALJ found Dailey's testimony inconsistent with regard to her alleged exertional limitations. He held that "[d]espite complaints of significant '6–8' constant pain and limited range of motion alleged, she drove to Geneva the day before the hearing, a ninety minute round trip." (T. 15). However, there is no evidence that Dailey made similar trips on a regular basis. More significantly, the ALJ failed to mention that Dailey also testified to having to stop "a couple times" to "rest" so that she could meet with her lawyer. (T. 42). Just because Dailey chose to endure pain in order to meet with her lawyer should not affect her claim. Her endurance of pain should not be held against her since it is not dispositive on the issue of her being able to work. *See Balsamo,* 142 F.3d at 81–82 (quoting *Nelson v. Bowen,* 882 F.2d 45, 49 (2d Cir.1989) (When " 'a disabled person gamely chooses to endure pain in order to pursue important goals,' such as attending church and helping his wife on occasion go shopping for their family, 'it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working.' ")).

Therefore, the Court finds that the ALJ's credibility determination is not supported by substantial evidence. In fact, it seems that Dailey's credibility should actually be enhanced according to SSR 96–7p. That Ruling provides that:

> a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements. Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a

variety of treatment modalities in an attempt to find on that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.

Social Security Ruling 96–7, 1996 WL 374186, \*7 (S.S.A.). This ruling describes Dailey's situation quite well. Dailey has seen a variety of physicians and specialists, has followed her prescribed treatments, has taken her medications (Feldene, Vicodin), and has even discussed other "experimental treatments" with Dr. Lasser. (T. 185). The record does not support a finding that plaintiff is not credible.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Dkt.# 9) is denied and the plaintiff's motion for remand (Dkt.# 3) is granted. The case is remanded to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this decision.

IT IS SO ORDERED.